No. 94-246

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

STATE OF MONTANA,

Plaintiff and Respondent,

v.

CHRISTOPHER P. BAYSINGER,

Defendant and Appellant.

FILED

JUN 14 1995

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Larry W. Moran, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Brian P. Fay, Angel, Screnar, Coil,
Bartlett & Fay, Bozeman, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General,
Kathy Seeley, Assistant Attorney General,
Helena, Montana

Mike Salvagni, Gallatin County Attorney,
Gary Balaz, Deputy County Attorney,
Bozeman, Montana

Submitted on Briefs: January 26, 1995

Decided: June 14, 1995

Filed:

_____
Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Appellant Christopher Baysinger was convicted of felony theft by a jury in the Eighteenth Judicial District Court, Gallatin County. Appellant appeals. We reverse.

The issue on appeal is whether sufficient evidence was introduced at trial to sustain a guilty verdict on the charge of felony theft against appellant.

The appellant and his brother, Jeff, were tried in the same trial. The charges against appellant and his brother arose from the following circumstances:

Vern VanAckeren, trustee chairman of the Bozeman Elks Lodge entered the Elks Lodge building on the morning of July 5, 1993, and discovered that a break-in had occurred. He reported the break-in to the Bozeman Police Department.

Sergeant Bill Dove and another officer investigated and found no evidence of forced entry to the exterior doors. Inside, the door to the manager's office had been pried open. The safe that had been kept in the office was missing, and damage had been done to the sheetrock walls in the area where the safe had been. The officers found a metal bar lying on the office floor. A two-wheeled cart was missing from the building. Four poker machines had been pried open and emptied of cash. A total of approximately $5900 in cash **was missing** from the safe and the poker machines. Audit tapes from the poker machines revealed that they

had been broken into between 3:28 a.m. and 3:55 a.m. on July 5, 1993.

This was the second time the Elks Lodge had been burglarized. In December 1992, there was a break-in and a safe was stolen. That burglary was never solved.

A new safe had been installed in the manager's office and was secured to the floor by eight to ten inch long bolts which ran through the floor and into a basement storage room where they were fastened by nuts. A padlocked door secured the storage room. To take the safe from the office, the nuts in the storage room had to be removed and the 200 to 250 pound safe had to be lifted vertically eight to ten inches for the bolts to clear the floor.

On July 5, the investigating officers found the storage room door and padlock in place and undisturbed. At the top of the storage room walls, between the ceiling joists, were spaces through which someone could crawl. However, the officers determined from the accumulation of dust and cobwebs that entry into the storage room had not been made through these openings. The officers also noted that dust and cobwebs had accumulated in the ceiling space where the bolts had protruded, concluding that the nuts had been removed sometime prior to the break-in.

The lack of damage to the exterior doors and the prior removal of the nuts indicated to Sgt. Dove that the burglary was an "inside job," i.e., the work of *a* current or previous employee or member. Sgt. Dove asked the manager who he suspected of the crime, and the

3

manager named two persons, one of whom was Jeff Baysinger, the appellant's brother. At the time of the break-in, Jeff lived in the Bozeman area, was employed as an assistant cook at the Lodge, and had been employed there for three or four weeks.

The investigation revealed that there were six authorized sets of keys to the Lodge building. The keys were marked "Do Not Duplicate," and were issued to the manager, the trustee chairman, the exalted ruler, the janitor, and the head cook. Jeff had not been given a set of keys. The sixth set of keys, including keys to the entire building, remained in the bar area during business hours and any employee could use them if needed; however, they were supposed to ask to borrow them before taking them from the bar area. When the Lodge closed at night, the bartender was supposed to lock the keys in the manager's office. None of the six authorized sets were found missing on July 5, and the bartender's keys were in the manager's office.

The Lodge employed a janitor whose hours were from 4 **a.m to** 1 p.m. About one week before the July 5 break-in, the janitor was working in the basement around 5 a.m. when he heard footsteps upstairs. Because no one else is allowed in the building at that **time** of day, the janitor became concerned and investigated. The janitor testified that he found Jeff standing outside the manager's office with his hand on the doorknob. According to the janitor, Jeff told him that he had seen the lights on inside the Lodge, and not knowing that the janitor was there, had decided to investigate.

4

Jeff told him that he had found one of the exterior doors unlocked. The janitor also testified that Jeff questioned him about the times that he and other employees came to work.

On July 6, 1993, Sgt. Dove interviewed Jeff. Jeff told Sgt. Dove that the janitor had discovered him in the Lodge building the previous week. Jeff stated that he had a 6 a.m. breakfast date that day, and that when he drove past the Lodge at about 5 a.m. he saw lights on and became suspicious. He stated that he found an unlocked door, entered the building, and began to look around when the janitor confronted him.

During the interview, Jeff also discussed his activities during the 24 hours surrounding the break-in. Jeff stated that on July 4 he and his girlfriend were together at her house in Belgrade. About 11 p.m., Jeff was called by appellant, who said he was coming to Bozeman from Missoula, where he lived. Appellant arrived at Jeff's girlfriend's house at about 1:00 or 1:30 a.m. on the morning of July 5. According to Jeff, he and appellant then left the house to go drink coffee and later spent the night in Bozeman at the apartment of a friend. The friend had not been there, but Jeff had his own key to the apartment and had slept there on previous occasions. Jeff's girlfriend initially stated that, on the night of the break-in, she also stayed at the apartment, but later changed her story on this point, stating that she remained at her house in Belgrade.

5

In her initial interview, Jeff's girlfriend also stated that Jeff and appellant had returned to her house around 4:30 a.m. on the morning of July 5. At trial, however, she explained that she had her *days* confused, and that on July 5 Jeff and appellant actually returned around 7:30 a.m. Jeff told Sgt. Dove that on July 5 he and appellant left Jeff's friend's apartment at 6:00 or 6:30 a.m. and returned to Jeff's girlfriend's house around 7:30 a.m. According to Jeff, he and appellant left Belgrade shortly thereafter to go fishing near Butte and returned to Belgrade on the morning of July 6 around 4:30 a.m. Later on the morning of July 6, appellant left to return to Missoula, and Jeff left to go to work.

On the morning of July 8, the police obtained a search warrant and searched Jeff's car. They found two bags, one containing $1727.10 in cash, and the other containing $506.39. They found marijuana, a marijuana pipe, a small scale, a flashlight, a wrench, an air canister, two pairs of gloves, a tire iron, and a set of vending machine keys.

Also, on the morning of July 8, Jeff received a phone call while he was at his girlfriend's house. Jeff's girlfriend was in the room with Jeff while he talked on the phone. At trial, the prosecutor asked her: "On July 8, 1993, did Jeff receive a phone call at your residence from [appellant]?" She answered, "Yes." She also testified: "In the room, [Jeff] covered the phone, and he

said he wasn't going to go down. And then he said something about he couldn't say the money was his savings."

On July 12, Sgt. Dove interviewed appellant regarding the Elks Lodge break-in. Before the interview, Dove read appellant his rights and informed him that Jeff had implicated him in the break-in. Appellant asked to see Jeff's signed statement, but Sgt. Dove did not have it with him. Instead, Sgt. Dove played a taped recording of Jeff's interview. Appellant listened to it, and as soon as the part of the tape where Jeff implicated him was played, appellant informed Sgt. Dove that the interview was over. Appellant stated, "That's the end of the interview. I'm not going to prison as a snitch."

On August 17, 1993, the District Court granted the State leave to file an information, which was filed the same day. Both appellant and Jeff subsequently pled not guilty. On December 29, 1993, Jeff filed a motion to sever his trial from appellant's, but withdrew that motion on January 7, 1994. On January 10, 1994, appellant and Jeff were tried together by the same jury. The jury returned guilty verdicts as to both Jeff and appellant on the charge of felony theft. However, the jury failed to reach verdicts on the charges of burglary and criminal mischief. The District Court declared a mistrial as to those counts, and on January 25, the court granted the State's motion to dismiss the burglary and criminal mischief charges.

On February 10, 1994, appellant filed a motion for a new trial. Hearing **on** the **motion** was held on March 15. Following an additional hearing on March 29, the District Court denied the motion. On April 4, 1994, the District Court filed sentence and judgment against appellant. On April 11, appellant filed his notice of appeal.

Was sufficient evidence introduced at trial to sustain a guilty verdict on the charge of felony theft against appellant?

Appellant argues that the State failed to introduce sufficient evidence at trial upon which reasonable persons could find him guilty beyond a reasonable doubt.

In reviewing a jury's verdict, this Court has repeatedly stated that:

> [A] defendant is entitled to an acquittal if reasonable persons could not conclude from the evidence taken in the light most favorable to the prosecution that guilt has been proven beyond a reasonable doubt.

State v. Mummey (1994), 264 Mont. 272, 276, 871 P.2d 868, 870 (citing State v. Haskins (1992), 255 Mont. 202, 210, 841 P.2d 542, 547; State v. Laverdure (1990), 241 Mont. 135, 785 P.2d 718; State v. Doney (1981), 194 Mont. 22, 29, 636 P.2d 1377, 1381).

The jury in this case found appellant guilty of felony theft. Section 45-6-301(1), MCA, provides:

> (1) A person commits the offense of theft when the person purposely or knowingly obtains or exerts unauthorized control over property of the owner and:
>     (a) has the purpose of depriving the owner of the property;

(b) purposely or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or

(c) uses, conceals, or abandons the property knowing that the use, concealment, or abandonment probably will deprive the owner of the property.

Section 45-2-101(39), MCA, defines the phrase "obtains or exerts unauthorized control" as including, but not limited to, "the taking, the carrying away or the sale, conveyance, or transfer of title to, interest in, or possession of property." In this case, we determine that the State failed to prove that appellant obtained or exerted unauthorized control of the Lodge's property.

The only uncontroverted evidence regarding appellant that was introduced at trial is as follows: appellant arrived at Jeff's girlfriend's house in Belgrade between 1:00 and 1:30 a.m. on July 5; appellant and Jeff left the house shortly after appellant arrived; appellant and Jeff returned to the house around 7:30 a.m. and then left again shortly thereafter; appellant and Jeff returned to the house on July 6 around 4:30 a.m.; and about 7:30 a.m. appellant left for Missoula. During an interview with Sgt. Dove on July 12, appellant stated, "I'm not going to prison as a snitch." None of these facts establish appellant's unauthorized control of the items stolen from the Elks Lodge

We hold that the State failed to prove the essential element of control over the stolen property by appellant and that the State failed to introduce sufficient evidence to support the jury's verdict finding appellant guilty of felony theft.

We reverse the judgment of the District Court.

9

Pursuant to Section I, Paragraph 3 (c), Montana Supreme Court 1988 Internal Operating Rules, this decision shall not be cited as precedent and shall be published by its filing as a public document with the Clerk of the Supreme Court and by a report of its result to Montana Law Week, State Reporter and West Publishing Company.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

10